Edward Green, Jr., appeals from the order denying his motion for new trial filed after judgment entered on a jury verdict in favor of American Cast Iron Pipe Company. The verdict and judgment were in Green's action for damages for his alleged wrongful discharge for violation of ACIPCO's Plant Rule 17. That rule prohibits an employee from "selling, furnishing, or otherwise trafficking in illicit drugs" on company property.
There are two issues, the resolution of which will determine whether the trial court erred in denying his motion for new trial:
I
 Whether the trial court abused its discretion in admitting into evidence the results of a polygraph examination upon which ACIPCO based its decision to discharge Green.
II
 Whether the jury correctly found that ACIPCO complied with its plant rules which required a unanimous vote of the Discipline Committee to discharge Edward Green.
 The Facts
Green, an employee of the General Yards Department of ACIPCO, was discharged for violating ACIPCO's Plant Rule No. 17, which prohibits:
 "Selling, furnishing or otherwise trafficking in illicit drugs on Company property."
The Discipline Committee of ACIPCO, which is responsible for investigating and voting on disciplinary actions for violation of company rules, unanimously voted to discharge him.
At ACIPCO, the Board of Operatives is composed of twelve employee representatives, each representative coming from a different area of the plant, who have been elected to hold that position by their fellow employees. The Board of Operatives assists in developing the rules and regulations for ACIPCO employees. These are set out in the employee handbook given to each employee.
Matters involving discipline of employees are investigated and handled by a Discipline Committee, composed of five members from management and four members of the Board of Operatives. Those who serve on the Discipline Committee are the Chairman of the Board of Operatives and three other members appointed by him.
Before the Discipline Committee considers any disciplinary action, the matter is first referred to its Investigating Committee. The latter is composed of the four employee representatives who serve on the Discipline Committee. The Investigating Committee makes an investigation into the matter in its capacity as a representative of the employee, after which it recommends to the Discipline Committee regarding what action that committee should take. If there is some discrepancy or dispute concerning the facts or there is need for further information in aid of the investigation, the employee can be asked to submit to a polygraph examination. Under the plant rules an employee can be required to submit *Page 18 
to such an examination. Should the employee submit to the examination, the results can be considered by the Investigating Committee or by the Discipline Committee when considering the charges. Green was aware of the polygraph examination provision of the plant rules.
Joe Curtis, Manager of Employment Safety and Security in the Personnel Department, had reason to believe Green was involved both in the use of marijuana and in trafficking in the drug on the job. This information came to Curtis from another employee at the plant, whereupon, Curtis called Green in to discuss the matter. Curtis informed Green that someone had turned him in for smoking marijuana and trafficking in it on company property. Then Curtis asked whether Green had done so. Initially, Green denied having used marijuana on the job; however, he later changed his story and told Curtis he, Green, had used it on company property within the last four or five years. He continued to deny trafficking in the drug.
Because Green changed his story during the interview and appeared to be uncertain about a number of his answers to Curtis's questions, the latter decided to hold the matter for a period of time. The plant was about to close for its customary shutdown during the week of July 4th and Curtis told Green they would discuss the matter further after the vacation break.
After vacation, Curtis had another meeting with Green to discuss the subject previously discussed. Again Green admitted using it on company property, but denied ever sharing, selling, furnishing or trafficking.
Subsequently, Curtis drew up a charge against Green for the possible violation of Plant Rule 17, and then turned it over to Sam Phelps, Personnel Director and Chairman of the Discipline Committee. A violation of that rule results in immediate discharge.
Curtis filed the charge because of his experience in dealing with numerous people using and trafficking in drugs at ACIPCO. He had found from his experience that users normally share and traffic in drugs. Further, he had received specific information that Green had trafficked in it. Phelps, in turn, turned the charge over to the Investigating Committee of the Discipline Committee.
At that time the four members of the Investigating Committee, who were the employee representatives on the Discipline Committee, were Luke Walker, Ira T. Read, Roy Howell, and Alex Fitts. It was these four individuals who met with Green to discuss the charge.
Roy Howell, Chairman of the Board of Operatives, and a member of the Discipline Committee and its Investigating Committee, suggested to Green that he, Green, take a polygraph test. Green agreed to do so.
Green, accompanied by Roy Howell and Luke Walker and also by George Headley, Manager of Employee Relations and Services, went to Alabama Polygraph Consultants, Inc., for the purpose of Green submitting to a polygraph examination.
When they arrived at the offices of Alabama Polygraph Consultants, Jim Rivers, President of that company, met first with George Headley and the two ACIPCO employee representatives. At that time the questions to be asked Green were discussed and agreed upon.
Rivers then met with Green and advised him that the polygraph examination was voluntary. Green then signed a consent form, after which Rivers conducted a pretest interview with Green, reviewing the questions Green would be asked during the examination:
"(1) In the past year, have you dealt in marijuana on ACIPCO property?
"(2) In the past year, have you worked under the influence of marijuana on ACIPCO property?
"(3) In the past year, have you brought any marijuana to work with you in ACIPCO property?
"(4) In the past year, have you smoked marijuana on ACIPCO property?" *Page 19 
During the pre-test interview Green initially answered "no" to each of these questions.
However, just before being hooked up to the polygraph machine, Green changed his answers to the questions which inquired about Green's use on the job within the last year. He admitted he had used drugs on the job within the past six months. Green requested Rivers to re-phrase the question whether Green had used marijuana on the job within the last two months.
Although at the trial of this case, Green denied changing his story, he admitted to Rivers during the pre-test interview that he had smoked marijuana on approximately six occasions during the past six months, excepting the immediate past two months, while on company property. He continued to deny to Rivers having ever used any marijuana in those last two months, having brought any to work within that period of time, having worked under the influence of any during the same period, and having ever sold or dealt in narcotics while on ACIPCO property.
Based upon this change of testimony, Rivers had Green sign the following voluntary statement:
"7/21/77
 "I Eddie Green ACIPCO during past year I have not sold any drugs at ACIPCO during last six months. I have smoke[d] pot on the job maybe six times but not in the past two months.
 "I have made this statement to Mr. Rivers at my own free will because it is the truth. Mr. Rivers has treated me fairly and [has] not promise[d] me anything in return.
/S/ Eddie Green"
Green admitted signing this statement and Rivers then conducted the polygraph examination. Based upon the results, Rivers concluded that, in his opinion, Green had not answered truthfully the following questions:
 "(1) In the past 2 months, have you worked under the influence of marijuana while on ACIPCO property?
 "(2) In the past 2 months, have you brought any marijuana to work with you?
 "(3) In the past 2 months, have you smoked any marijuana while on ACIPCO property?
 "(4) In the past year, have you dealt in any marijuana while on ACIPCO property?
Rivers then orally advised Green of his opinion and results, and also orally advised George Headley and the two employee representatives, Roy Howell and Luke Walker, of his findings. Roy Howell also told Green that Rivers had reported to Howell, Headley, and Walker, the results of the examination. A written report to the Discipline Committee followed.
The Discipline Committee then convened with six of its nine members being present. Present were: Roy Howell, Alex Fitts, Luke Walker, S.F. Carter, E.D. McCauley, and Charles Meads. Absent members were S.P. Phelps, J.F. Curtis, and Ira Read.
If a Board of Operatives member who is also a member of the Discipline Committee is to be absent from a particular Discipline Committee meeting, the normal procedure for appointing his replacement is for the Chairman of the Board of Operatives to appoint an employee representative for that absent member. This ensures that the employee representatives have at least four of their number present at any Discipline Committee meeting. In this case, Roy Howell, Chairman of the Board of Operatives, appointed Charles Meads, then a member of the Board of Operatives, to take the place of Ira T. Read at the meeting.
Green was present when someone reported the results of Green's polygraph examination to the Discipline Committee, after which a vote was taken whether to discharge Green for violating Plant Rule 17. The motion to discharge Green was made by S.F. Carter, and seconded by Charles Meads, one of the employee representatives on the Board. The Committee members present, a quorum, voted unanimously to discharge Green for violation of the rule. *Page 20 
The minutes of the Discipline Committee were duly recorded by George Headley, who, in the absence of Curtis, the Recording Secretary, had been asked by the latter to record them.
Green's matter was handled before the Discipline Committee in a customary and routine manner. After Green was discharged, ACIPCO paid him everything he had earned while working there, including any bonus, any paid vacation, and any severance pay owed him.
 I
ACIPCO's Plant Rules provide that an employee can be requested to submit to a polygraph examination. Green voluntarily did so; the Discipline Committee considered the results when deciding to discharge him and after doing so, terminated his employment. In Smith v. American Cast Iron PipeCo., 370 So.2d 283 (Ala. 1979), this court held that an employee could properly be discharged for refusing to submit to a polygraph examination when requested to do so (where the company rules provided for such request and examination). InSmith, this court discussed the distinction between admissibility of such examination in criminal and civil cases, referring to the fact that the polygraph requirement is not void as against public policy. We today hold that under the facts of this case, results of the polygraph test given Green were admissible in the trial of his action for wrongful discharge. The trial court did not err in admitting this evidence.
 II
Green contends that because less than the total number ofmembers of the Discipline Committee voted that he be discharged, the action of the unanimous vote of a quorum present was ineffective and failed to comply with ACIPCO's work rules.
ACIPCO's work rules, in effect during and throughout the term of Green's employment, contains the following:
 "The Discipline Committee has jurisdiction over all disciplinary cases which involve violation of plant rules serious enough that more than a reprimand is involved. This means every case involving a week layoff or more. Cases of Plant Rule violations are brought before the committee for review and action. The four employee representatives must be completely informed about the case and their votes count the same as other committee members. If an employee is to be laid off or discharged, the committee must vote unanimously. In the event the committee cannot agree the case is referred to the Board of Management.
There were six of the nine members present at the Discipline Committee meeting. Charles Meads was appointed by the Chairman of the Board of Operatives to sit on the Discipline Committee in the stead of Ira T. Read, absent from the meeting as one of the employee representatives. Read was, at the time, also an employee representative member of the Board of Operatives. This was in accord with long established custom and was the normal practice followed in the case of an absent Discipline Committee employee representative member of the latter committee. This ensures that the employee representatives have at least four representatives present at any Discipline Committee meeting. As stated, this was a well-established, accepted practice at ACIPCO, acquiesced in by the employees. Under the facts in this case, that acquiescence works an estoppel of Green's assertion to the contrary regarding any improper composition of the Discipline committee.
As stated by the Supreme Judicial Court of Massachusetts:
 "`Where one, without objection, suffers another to do acts which proceed upon the ground of authority from him, or by his conduct adopts and sanctions such acts after they are done, he will be bound, although no previous authority exists, in all respects as if the requisite power had been given in the most formal manner.' Circumstances may warrant *Page 21 
an inference that acts of a committee, openly done, and extending over a considerable period of time, were known and assented to by those who appointed the committee. . . ."
McNeil v. Boston Chamber of Commerce, 154 Mass. 277, 285,28 N.E. 245, 248 (1891).
The language of the employee handbook requiring the Discipline Committee to vote unanimously clearly requires those present to vote unanimously to discharge an employee. It does not, however, require that all the members of the DisciplineCommittee be present and vote unanimously.
It is a generally accepted principle that a committee of a body may act when a quorum or a majority is present. SeeRoberts Rules of Order, § 52. See also Canada-Atlantic PlantS.S. Co. v. Flanders, 145 F. 875 (1st Cir. 1906); Gumm v. Cityof Lexington, 247 Ky. 139, 56 S.W.2d 703 (1933); McNeil v.Boston Chamber of Commerce, supra, Harroun v. Brush ElectricLight Co., 152 N.Y. 212, 46 N.E. 291 (1897).
The harshness of a general rule requiring all members of a committee to be in attendance to vote on committee matters is apparent. Again, from McNeil:
 "It would be very inconvenient in practice if a committee of this character, whose duties involve many acts in carrying out the general purpose of their appointment, could do nothing if a single member should be absent. There is sufficient precedent for holding that a majority may act, and such is the better rule. . . ."
It is completely consistent with logic, reason, and precedent, that we hold there was due compliance, in all respects, with ACIPCO's work rules, as set in the Employees Handbook of Plant Work Rules, in and about both the composition of the Discipline Committee (including designation of a substitute member) and that the procedures followed culminated in Green's discharge.
For the reasons set forth above, the judgment below is due to be and is hereby affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and ADAMS, JJ., concur.